El Papel, LLC v. Burman, II, LLC v. City of Seattle Good morning, Your Honor. I'm Roger Glynn on behalf of the City of Seattle. Brian Rowe is here representing Attorney General Ferguson. Our intent is that I will stop at 10 minutes to inquire if the Court has any questions specific to the Washington moratorium for Mr. Rowe, and then I'll ask if Mr. Rowe has any questions he wants to add to what I've All right. Thank you, Your Honor. May I proceed? May. My name is Jonathan Houghton. May it please the Court? And I'm here with Pacific Legal Foundation on behalf of property owners El Papel and Burman, II. And, Your Honors, I'm going to aim to reserve two minutes of my time for rebuttal. Preventing owners from evicting tenants that breach their leases intrudes on one of the most fundamental rights of property ownership, the right to exclude. That was from the Supreme Court's 2021 COVID eviction moratorium decision of Alabama Association of Realtors, and that is exactly what transpired in this case. The eviction bans of Washington and Seattle were a naked transfer of property rights. They took property rights from A and gave it to B for the benefit of B. And in this case, Your Honor, they took the right to possess and exclude from El Papel and Burman, and they gave the right to possess and exclude to these tenants so that the tenants could shelter in place during COVID and so that the government could create public pandemic housing. The right to possess and exclude were commandeered for the public benefit, and these rental property owners were singled out to pay the cost that the government imposed to allow tenants to shelter in place during the COVID pandemic. Why isn't this governed by ye? Your clients invited the tenants on. Seems to me that's the operative issue. It absolutely is, Your Honor, and thank you, Your Honor. I wanted to get to that and also to Justice Bybee's question and Jeevon's that, you know, doesn't the fact that these are tenants put it within ye? There's a factual reason why the answer to that is no, Your Honor, and there's a legal reason why the answer to that is no. Factually, these tenants are here at the government's invitation. The government invited the tenants to stay on and remain in these properties for public pandemic housing. The government invited them to stay on even if they didn't pay rent. The government invited them to stay on even if they breached the material terms of their leases. The government invited them to stay on even if the lease terms expired. How's that different than ye? Well, ye, Your Honor, is a rent control case where the property owners in ye actually had a greater power to evict than our owners had. In ye, if the tenant violated the terms of the lease, ye could evict them. In ye, if the tenant didn't pay rent, they could be evicted. We did not have those rights. El Papel and Berman did not have those rights because those property rights were taken away by the government's eviction moratorium. That, Your Honor, I think is one of the key distinctions is that the owners in ye actually had greater rights to possess and exclude than our clients had in this case. Isn't this a matter of degree though? Because when it comes to landlord tenant relationships, there's always regulation and there's always limitations on a landlord evicting someone. You can't just, you know, I didn't get rent the day it was due, wander up to the door, knock and say, you must leave because you haven't paid rent, right? The law imposes a whole structure of rules that you have to go through and notice and proceedings. And it's often months that somebody is sitting in the property without paying under just normal times. So isn't this just a matter of degree? Why is this so much different? It's not a matter of degree, Your Honor, when it's the right to possess and exclude. The right to possess and exclude, the court has said, and see your point in many other cases, that that is a per se categorical taking. And once the right to possess and exclude is taken, that is an unconstitutional taking irrespective of any other factors. My point is, my point is, if the ordinary rule, let's say the ordinary rule is that you can't evict until 90 days has passed, until a breach of the contract has occurred. Why isn't that a taking under your theory? Because you're not allowed as the landlord to remove the person from the property for 90 days, even though they're not performing their contract. Because in that particular instance, Your Honor, you can evict. In that particular instance, that's a notice provision. You can evict upon 90 days, which is distinct from what happens in this case where they say that you cannot evict. And another thing, Your Honor, that I would like to address in response to Your Honor's earlier question about regulation to the landlord-tenant relationship and use. The taking of the right to possess and exclude is not a regulation of the landlord-tenant relationship. I think what gets lost in a lot of these cases discussing the landlord-tenant relationship is what Yee actually said and what Loretto actually said and the rights that are in play here. When Yee was talking about regulating the landlord-tenant relationship, Yee mentioned two things, price controls and discrimination. Those are the regulations of the landlord-tenant relationship, not the right to possess and exclude. I disagree with you because in Yee, the court specifically said that in that case, the petitioners concluded that the ordinance transferred a discrete interest in the land, the right to occupy the land indefinitely at a sub-market rent. And that was the issue that the petitioners raised. They were arguing that there was a transfer of the ability to exclude or at least that they got to stay there at a sub-market rent. So why isn't it the same? That was Yee's argument, Your Honor, but the court disagreed with that and said that when we're talking about rent control, we're not talking about the right to possess and exclude. This, Your Honor, that's the distinction is that when Yee, they were talking about money. Yee was about how much money can we charge? We want to be able to charge more money. That was the owner. And the court said, fine. But when the argument is how much rent can you charge, it is not a physical taking. We're not talking about the right to possess and exclude because if you want to, you can evict your tenant. And one of the things that Yee, excuse me, Your Honor, specifically said was that if the owner was compelled to rent against their will or compelled to retain someone in occupancy perpetually, then it was going to be a physical taking. And that, Your Honor, is in accord with Loretto. It's in accord with Cedar Point. It's in accord with Alabama Association of Realtors. Simply due to the fact that the landlord entered into the rental market does not require him to waive a physical takings claim. And regulations upon the landlord-tenant relationship, regulations upon the landlord-tenant relationship are distinct from physical takings. It was Loretto that first said that. That because a similar argument was made by the government, the teleprompter in Loretto. They said, look, this is a rental building. All we're doing is regulating your use here. If you don't want to have a cable box on your building, then don't be a rental anymore. All we're doing is regulating the use. And the court said two things. It said, no, you're not. This is a physical taking. And two, the landlord is not required to waive a physical takings claim in exchange for participating in the market and the landlord-tenant market. A similar argument was made in Horn. Horn, obviously, is a personal property case dealing with raisins, but the government made the same type of argument. The government said, you are using these raisins for raisins. You could use them as grapes. You could make wine. You could do something else. But if you want to participate in this market, then all we're doing is regulating how you use it. The Supreme Court again said, no. When you physically take property, it is not a regulation of use. It is a physical taking that requires categorical treatment. This same argument happened again in Cedar Point. In Cedar Point, the dissent and the board made the argument that all we're doing is regulating the right to exclude. And the regulation of a right to exclude is not a taking. And in Cedar Point, the court said, no, it is not a regulation of use. Per se takings are categorical physical takings. And that was also echoed in Yee. And all of these lead up to the court's decision and Alabama Association of Realtors. And I apologize, Your Honor, if you had a question. Okay. Slightly different issue. All we have left right now is a monetary damages claim. We're seeking nominal monetary damages, correct? Correct, Your Honor. You're seeking that against the Washington Attorney General in part, correct? Yes, Your Honor. A state official in his official capacity is not a person under 1983 for nominal damages. How can you maintain an action against the Attorney General of the State of Washington for money? Well, I think, Your Honor, there's a distinction between a just compensation claim and a nominal damages claim. I think that a nominal damages claim is available because it redresses a constitutional right and it also impacts the relationship between the parties. So I think, Your Honor, that it is available against the State of Washington. And at the minimum, it's available against the City of Seattle. Setting aside the city issues more, can you assert a nominal damages claim under 1983 against the Washington Attorney General? I don't see how you can because there's case law saying that's not a person suable under 1983. I believe, Your Honor, that we can because it does redress the constitutional right. And I think that's distinct from a just compensation claim. I think if it was a just... It's not about redressability. It's about immunity. And the Supreme Court has said that states are not subject to damages awards in federal court. I understand that, Your Honor. And my understanding is if that were a just compensation claim, then, yes, that would be something that I would agree with. But I think in terms of a nominal damages claim... I don't understand that. What's your cause of action if it's not the takings claim? Our cause of action is the takings claim, Your Honor. Well, then what difference does it make whether it's nominal or not nominal? Well, I think it's in the measure of damages, Your Honor. Well, yes. I agree that everybody's going to agree that if you had a million dollars, that's a lot more than one dollar. But I don't understand the difference of degree, why that makes a difference for a takings claim. Because I think, Your Honor, that in this sense, in the context of this, nominal damages essentially has a similar effect as would a declaratory judgment. It changes the relationship... Do you have any case that supports this? I've never heard this principle. Not off the top of my head, Your Honor. You can't think of anything that says nominal damages is not real damages for purposes of sovereign immunity, but it is real damages for purposes of takings? I do not, Your Honor. I mean, I might be willing to pull a dollar out of my wallet and give it to everybody to make this whole thing go away right now, but that doesn't really tell us that that wouldn't be damages in some way. Well, if it comes with a determination, Your Honor, that Cedar Point applies, then I will take the court's dollar. But no, I do not have any cases that say that, Your Honor, this was not an issue that was raised by the lower court, nor an issue that was raised by the parties. So, candidly, no, I don't have any cases that say that. Is it your position that the state has waived its objection to damages? I think it's waived its objection... It's waived its sovereign immunity? Yes, Your Honor. They haven't made a sovereign immunity claim in this action. Well, let's see. That might work. So you're going to collect this from the state or you're going to collect this from... Did you bring a 1983 suit here? Yes, Your Honor. It is a 1983 suit. Well, because if it's a 1983 suit, the fiction is that if you sue them in their individual capacity, but how does the state get to waive Mr. Ferguson's individual capacity? That's personal to him. That's not the state's to waive. The state might have a sharing arrangement. It might have an insurance policy that says, gee, if you get sued, losing your individual capacity, we'll pay the claim. But that's their business. To follow up on that, I don't think you've sued the Attorney General in his individual capacity, have you? I think it's only his official capacity. Allow me to check, Your Honor, and I apologize for not having the answer of that off the top of my head, but I would agree with Judge Forrest that I think, yes, we've sued him in his official capacity, not in his personal capacity. That's paragraph 11. Yes, we've sued him in his official capacity, and I apologize for not having the answer to that, Your Honor. If you want to save some time. Yes, I would. I'd like to save two minutes for rebuttal. Thank you. Good morning, and may it please the Court. I am Roger Winn for the City of Seattle. Plaintiffs do not bring their claim under the Penn Central factors, which are the default for any claim that a regulation affects a taking. Instead, they pursue a narrow exception to that default, a per se physical invasion takings claim. The test for that claim is whether the government has authorized a third-party stranger to enter your property. And Loretto, FCC, and especially ye, as this Court recognized in Ballenger, hold that a regulation passes that test, a regulation of the landlord-tenant relationship, passes that test because it's the landlord, not the government, who invites the tenant onto the property. It's a round peg, square hole situation. Now, plaintiffs posit a different approach, that a tenant morphs into an invader whenever the government adopts a regulation that would preclude the eviction of a tenant whenever the tenant violates a particular material lease term. And in their parlance this morning, they say that instantly means that possession, the right to possess and exclude, has been transferred from the landlord to the tenant. I'd like to address two basic problems with that approach. One is that it can't be confined to the moratoria before you today. And the other is that it can't be squared with ye. So first, there is no limiting principle to their approach. They ask you to follow a before-and-after test. If before the regulation, the landlord could evict for the violation of a particular material lease term, and if afterward, the landlord can't, then bam. Physical invasion taking, per se, end of story. And Judge Forrest, you're absolutely correct in probing with Mr. Houghton whether this can be contained to these moratoria rather than, say, to all the other limitations we have on evictions. Washington State, for example, allows a superior court judge to delay an eviction for up to 90 days. Under their approach, that is a temporary taking during that period. Also, this has to apply to any material lease term. So under their approach, the federal government affected a per se taking when they enacted bans on racial discrimination, at least with respect to those landlords whose lease specified occupancy by whites only. You get my point, that their approach would jeopardize any landlord-tenant regulation that alters a material lease term. That's contrary to Loretto, which announced the per se test and reaffirmed that regulations of the landlord-tenant relationship would pass that test, and it's also contrary to Yee, where I'd like to turn next. Well, so that's where my question was in our argument at the beginning of the day. There's this statement in Yee that says that even though you've invited them on, at some point if the government forces you to never let them go, to never get them off, the wording in Yee is in perpetuity, then perhaps we're in a different situation. So in the earlier case, I think one of the arguments was, well, these moratoriums were time-limited, and so it was a rolling basis, right? They're going to expire in six months or they're going to expire in three months. That doesn't seem very compelling to me because if the government could just issue a moratorium and keep changing the date in perpetuity but always having some solid date and then we'll just amend it and extend it out, how is that not in perpetuity? So a couple of points, Judge Forrest. First, that quote from Yee is premised on the landlord being forced against their will to continue to serve as a landlord. In this as-applied challenge, there is no evidence that these plaintiffs wanted to cease being a landlord. So the analysis here should end at that point. But to your point, as Ms. Sepe said, there is— I don't know. The language that I remember from Yee is compels a landlord over objection to rent his property or to refrain in perpetuity from terminating a tenancy, not that you're going to change the whole character of the property, but terminating a tenancy relationship. Right. And I read as against their will as modifying both of those points, against their will to become a landlord and against their will to serve in perpetuity as a landlord. But passing that— But wouldn't that mean, if that's right, wouldn't that mean that a government could in perpetuity just keep extending the tenant's pass on paying rent forever and ever and ever and nothing you can do about as the landlord for 10 years, too bad. And maybe at the end of 10 years, that person is going to come up with all that money. Maybe. Right. So as Ms. Sepe pointed out, no court has actually explored and given flesh to the bone of what in perpetuity— Right. So that's what I'm exploring. At what point? I mean, can you give me— At some point, we've got to be able to say to the government, you can't just make the landlord sit there with somebody who isn't going to pay forever. Like, what's the line? So first, if you have an ordinance that says—that has no end date on it, that could be in perpetuity. And then we go back to the question about whether it is actually forcing the landlord against their will to be a landlord. In the situation like we have here, I would hope that a court would apply a functional test. Does this ordinance effectively make it impossible for a property owner to cease being a landlord for— and this is where you'd have to come up with the right term—with no expected, no promised, or no functional end date? And that's not the case here. We have, in the Seattle example, a two-month moratorium that was extended nine times each time on average for about three months based on particular findings that lasted for about two years. That is not in perpetuity. I don't believe this case provides the court an opportunity to express what in perpetuity means. It seems from your argument that the government is fine in its regulations so long as it would allow a landlord to say, I don't want to be a landlord anymore. I'm just going to sell my property. And I think the Washington rules said that. There were some exceptions to the eviction if you wanted to sell or if you wanted to live in the property yourself as the landlord. So that's the only choice that a property owner is going to have under your view of the law is that we could have rental restrictions go on for a very, very long time. We could keep renewing them. We could keep extending them. But so long as we let you say, oh, I don't want to be a landlord at all anymore. I'm just going to sell this off. We're good. That is so. Yes, Your Honor. The in perpetuity in a situation where you have extensions of them, again, I think you'd have to apply a functional test. And here, when you look at each of those extensions, you see that it is done for a limited period of time based on particular findings that are specific to the public health and economic needs related to the pandemic. So I don't think that this this case presents an opportunity to really probe the in perpetuity question, which is an interesting one, but it's not one that you need to resolve here because it didn't happen. Now, my friends try to distinguish the by claiming that it's an economic use case, not a physical takings case. Now, that's incorrect. To be sure in ye, you see the court reacting to about a half dozen claims that the plaintiffs there made that might sound in economics, things like it transferred wealth from landlords to tenants. But in response to each of those arguments, the court brought it back to the controlling case law and said, no, no. This law is Loretto and FCC. And under it, we don't have a physical invasion taking here. Why? Because it's the landlord who has invited the tenant onto the property, not the government who has authorized them to come on. Again, round peg, square hole. And the same is true of the California Court of Appeals decision earlier in ye that my friends cite at length in their reply. Yes, in that passage, the California court there said that you're giving us some economic justifications. Immediately after that, though, the court returned to the proper law. And I'll quote, moreover, if Loretto were not clear enough that a rent control ordinance does not constitute a per se taking, that conclusion was punctuated by FCC. And then just like the Supreme Court did later in the same case, the state court said no taking here because it's the landlord, not the government who invited the tenant onto their property. And every single district court that has entertained a per se physical invasion taking claim against the pandemic era eviction moratorium has applied ye to reject that claim. The only exception that we can find is Heights Apartments from the Eighth Circuit. And we think this court should not follow that for three basic reasons. First, you can't square it with this court's recognition in Ballenger that ye controls regulations of the landlord-tenant relationship. Secondly, the panel in ye, excuse me, the panel in Heights Apartments said they distinguish ye on a faulty factual premise, claiming that the landlords there only wanted to exclude future tenants, not evict current ones. That can't be squared with the language of ye. And finally, they relied on Cedar Point. And that's a case upon which that panel had no briefing and no argument. And Cedar Point is distinguishable. It's a straight application of the Loreto test to a situation there where the government forced property owners there, it was agricultural operators, to suffer an intermittent invasion by third-party strangers there, union organizers. And Cedar Point distinguished analogous situations analogous to this where the government regulates how a property owner must treat those whom they've invited onto their property. And again, every court that we have found save Heights Apartments that has considered a Cedar Point argument in the context of a landlord-tenant regulation has distinguished Cedar Point. Again, that just underscores why Heights Apartments is not something this court should follow. In conclusion, the controlling case law from the Supreme Court is clear when we are talking about the application of this per se test to the landlord-tenant regulation. That's Loreto, FCC, and ye as this court recognized in Ballinger. Also clear is the overwhelming weight of persuasive authority applying ye to reject a per se physical invasion taking claim in the very context that you have today of an eviction moratorium that was enacted during the pandemic. We respectfully ask this court to apply that controlling and persuasive case law and to affirm the district court. Now, I'd like to ask whether the court has any questions specific to the Washington moratorium for Mr. Rowe. We probably have some questions about the Attorney General's position. Very good. I'll yield to Mr. Rowe. Thank you. I'll go right to the point. I'd like to hear about the Attorney General's status here. Yes, Your Honor. In response, I believe, to the earlier questions from the court, it is true that the plaintiff only sued the Attorney General in his official capacity. We don't have an individual capacity claim pled here. As to the waiver question, I don't think there is any waiver. I do believe that we asserted an immunity defense in our answer to the complaint, but we just did not develop that defense. That was not part of our motion for summary judgment. Why not? There were strategic reasons why we decided not to pursue that defense at that stage. I'm not sure I should talk more about that. Our case law talks about how sovereign immunity is waivable and that even if you plead it and you're responsive pleading, if you take contrary actions throughout the litigation indicating that you're not asserting that argument, you waive it. So why haven't you waived it? There could be a question of waiver. I guess that's not been developed in this case only. This is a very limited case. It is about basically nominal damages for $1. We don't basically have evidence or intention not to pursue that defense in this case. So I suppose that could be construed as a waiver. I concede that. And that would be waiver on behalf of the state, that is that you would accept that Mr. Ferguson has been sued in his official capacity and therefore he represents the state of Washington. The state of Washington is waiving its defense to sovereign immunity. In this case, I think that would be right, Your Honor. Yes. The only other issue I wanted to talk about was the issue that the panel has already discussed, which is that there is this extra exception in the Washington state moratorium. I don't think I need to repeat anything there. I would just like to emphasize that the Attorney General joins the city's arguments in full. What matters for both moratoria is the fundamental fact that neither one imposed invasions by third-party strangers. They merely regulated landlord-tenant relationships that started at the landlord's invitation. On that basis, the district court's judgment should be affirmed. Any further questions? Thank you. Thank you for your argument. Thank you. Your Honors, this case is governed by the Supreme Court's determination in Alabama Association of Realtors. When it held that preventing owners from evicting tenants who breached their leases intrudes on one of the most fundamental rights of property ownership, the right to exclude. In making that determination, the Supreme Court specifically cited to Loretto, and in making that determination, the Supreme Court omitted any reference to ye and any reference to the landlord-tenant relationship. This court should follow Alabama Association of Realtors and equally hold that these eviction moratoriums were a per se physical taking. How did you assert as an alternative a regulatory taking? A regulatory taking, I think, Your Honor, there is a bit of a misnomer in that, in that what we're dealing with is what property right are we focused on, and we're focused on the taking of the right to possess and exclude. And as Cedar Point said, taking the right to possess and exclude can come through a regulation. If the court is referring to Penn Central, Your Honor, then Penn Central deals with a different property right, regulating the right to use, which is not at issue here. This is about the right to possess and exclude, which is a per se physical taking. And briefly, Your Honor, responding to some of the arguments in opposition, with respect to the identity of the beneficiary of this right, meaning the tenant, the fact that the beneficiary of the right to possess and exclude was a tenant does not mean that the property right was taken away. All that means is in this naked transfer of property rights, taking from A and giving to B, B, the tenant, was the beneficiary of it. But it does not change the fact that the property right was taken away to start with. I do see that my rebuttal time has quickly concluded, Your Honor, but I'm happy to answer further questions if the court has any. Doesn't look like it. Thank you very much for your argument. Thank you. All right. The matter of El Papel LLC and Berman II LLC versus the City of Seattle et al. is submitted. That concludes argument for today, and the court stands in recess. All rise.
judges: BYBEE, FORREST, Gordon